# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JUNMYUNG LEE | Case No. 24-cr-10035-JEK |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States of America submits this Sentencing Memorandum in advance of the sentencing currently scheduled for Junmyung Lee ("Junmyung" or the "defendant").[1] The defendant played an integral role in a sprawling criminal organization that operated a multi-state prostitution network and money laundering operation. Working at the direction of Han Lee, the leader of the organization, Junmyung had multiple roles in the organization, and it would not have been successful without his active participation.

For his involvement in this organization, on October 30, 2024, the defendant pleaded guilty to a two-count Indictment charging him with conspiracy to persuade, induce, entice, and coerce others to travel interstate to engage in prostitution, in violation of 18 U.S.C. § 371, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). There is a plea agreement ("Plea Agreement") pursuant to Rule 11(c)(1)(B) in this case. D.E. 119. Given the nature and circumstances of Junmyung's offenses, his history and characteristics, and the factors set forth in 18 U.S.C. § 3553(a), the government recommends that this Court impose a sentence consistent with the sentencing recommendation in the Plea Agreement. Such a sentence is sufficient, but not greater than necessary to achieve the goals of sentencing pursuant to 18 U.S.C. § 3553(a).

---

[1] The government refers to the defendant by his first name here for clarity sake, given that other co-defendants share the same last name. The government refers to his co-defendants by their first names as well for the same reason.

I.  **Application of the Sentencing Guidelines**

Junmyung's conduct is not in dispute and is summarized in the Presentence Report ("PSR") prepared by United States Probation ("Probation") at paragraphs 8-73. The United States agrees that the defendant's base offense level is 14 pursuant to USSG § 2X1.1 and § 2G1.1(a). The United States also agrees that the offense level is increased by two levels because Junmyung was convicted under 18 U.S.C. § 1956 pursuant to USSG §2S1.1(b)(2)(B). The government also agrees that five levels are added because there are more than five victims for which the offense level would have been equally serious, pursuant to USSG § 2G1.1(d)(1) and § 3D1.4.

The government disagrees with Probation that the defendant should be subject to a two-level enhancement under USSG § 2S1.1(b)(2)(B) for engaging in sophisticated money laundering. The defendant's engagement in money laundering by concealment was anything but sophisticated. He made structured cash deposits, including two on the same date at the same bank (one at teller/counter and other at an ATM); he used cash he obtained from Han Lee ("Han") for a downpayment for a luxury vehicle; and he engaged in peer-to-peer transfers of money with Han and other co-conspirators. This type of money laundering is simply classic concealment money laundering. He did not use fictitious entities, corporate shells, layering of transactions nor offshore financial accounts[2] like his co-conspirator, Han, who the government contends, and this Court agreed, engaged in sophisticated money laundering. Based on this, the government argues that this enhancement is not supported by the evidence pertaining to this defendant. As such, the Court should not impose a sophisticated money laundering enhancement.

Junmyung is entitled to a three-level downward adjustment for acceptance of responsibility pursuant to USSG § 3E1.1. Junmyung also meets the criteria set forth in USSG §§ 4C1.1(a)(1)-

---

[2] *See* USSG § 2S1.1(b)(3), Application Note 5.

(11) and as a Zero-Point Offender, his offense level is further reduced by two levels. USSG §§ 4C1.1(a) and (b). Based on the above, the parties believe Junmyung's total offense level is 16. The corresponding GSR, at Criminal History Category I, is 21-27 months.

## II. The Factors Set Forth in 18 U.S.C. § 3553(a)

The sentencing factors outlined in 18 U.S.C. § 3553(a) support the government's recommended sentence. As this Court is aware, the guidelines are a "starting point and initial benchmark" in sentencing proceedings. *Gall v. United States,* 552 U.S. 38, 49 (2007). After that calculation, the Court must consider the seven factors outlined in §3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to protect the public from future crimes of the defendant. *Id.* at 50, n.6.

### A. The Nature and Circumstances of the Crime

#### 1. Junmyung's Critical Role in the Profitability of the Criminal Enterprise

As detailed in the PSR, Junmyung's role as the "booker" was critical to the success of Han's profitable enterprise. As Han's business expanded, she needed assistance in maintaining records, answering phones, vetting sex buyers and booking appointments. Han, the leader of the organization, speaks limited English. Junmyung was hired, in part, due to his English-speaking skills. Junmyung communicated with the prospective sex buyers, screened them, and – when he deemed it safe to do (based on Han's training) – arranged the logistics of their meetings with the commercial sex workers. Junmyung is intelligent and savvy – he was able to successfully screen sex buyers to protect the organization from law enforcement interest and to attempt to protect the sex workers from sex buyers who could compromise their safety. Junmyung is also organized and dependable – he arranged logistics, instructed the men to be discrete to avoid the attention of neighbors, collected profits from the brothel locations regularly, and transported and assisted the

women upon their arrivals to and departures from the Boston-area brothels. Given his organization and reliability, Han could count on him to mirror her impeccable record keeping in the appointment books he maintained and to attentively respond to the large volume of interested sex buyers and efficiently book appointments using the brothel phones. In exchange for his work, Han paid Junmyung a substantial salary ranging from $6,000 to $8,000 per month.

Because of Junmyung's dependability, including his willingness to place a brothel apartment lease in his own name, Han was able to expand her business and bring in more profits. During the entirety of the conspiracy period, the illicit prostitution business made at least $5.6 million off of approximately 9,450 commercial sex dates. Junmyung's traits made him a good employee for Han and allowed him to personally profit royally off of women selling their bodies for sex to complete strangers thousands of times.

**2. The Harm to the Women**

Dozens and dozens of women engaged in commercial sex work for this prostitution organization over many years. The co-conspirators set up the infrastructure to entice the women to travel from other states to Massachusetts and Virginia to sell their bodies for sex. While the government believes that the women engaged in sex acts under the legal standard of "voluntarily," they were vulnerable women who were exploited by the organization.[3] The Government also asserts that while the women were not "forced" to engage in commercial sex, as defined by federal law, of course this was not their *choice*. To have a price set for one's body and to engage in repetitive sex acts with strangers is a choice for those with limited or no other choices.

---

[3] The government notes that the evidence gathered during the investigation did not support charges of sex trafficking by force, fraud or coercion, in violation of 18 U.S.C. § 1591 which would have subjected the co-conspirators to a fifteen-year mandatory minimum period of incarceration.

4

The crime of prostitution often is viewed as a simple and victimless crime. Such a perception ignores the long-term impact on the women and society. At the most basic level, profiting off the sale of other women's bodies involves the degradation of women because their bodies are bought and sold as commodities. In examining the seriousness of the offense, the Court must review the harm to these women, as subtle as those harms may appear on their face. *United States v. Cunningham*, 680 F.Supp. 2d 844, 855 (N.D. Ohio 2010). Fifty-five percent of women and children who have been sold in the commercial sex trade report suffering from PTSD and 42% report attempting suicide at least once.[4] The women engaged in prostitution share common risk factors which make them vulnerable to this crime. It is not unusual for women to have been abused when they were young, been victims of rape, suffer from addictions, experience poverty or experience abusive relationships. While not all women engaged in commercial sex have difficult backgrounds or upbringings, it is not uncommon for these factors to be present. In this case, most of the women interviewed were undocumented immigrants with no or expired legal status in the United States. Some of the women were recruited while in their home countries to come to the United States and engage in commercial sex work upon arrival. Others began commercial sex work shortly after entering the United States. And yet one indicated that it was not until she arrived in Boston in November 2023 that she realized what type of work she was expected to engage in to make money on behalf of Han's business.

**3. The Scope of the Prostitution and Money Laundering Conspiracies**

The prostitution business spanned multiple states, existed for years before law enforcement interdiction, and resulted in its co-conspirators making millions of dollars off commercial sex of other women. The multiyear investigation led by Homeland Security Investigations and the

---

[4] "The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities." Annals of Health Law 23, 61-91.

Cambridge Police Department showed that the prostitution organization operated two websites, www.bostontopten10.com and www.browneyesgirlsva.blog that operated as fronts for commercial sex services in the greater Boston and eastern Virginia areas. Women were advertised as "nude models" on more than one website as they traveled a circuit and engaged in commercial sex for the organization. The women in the advertisements were updated frequently, with postings that included "open" or "coming soon," showing a frequent rotation of women that kept the demand, and therefore profits, high.

Commercial sex operated out of brothels, specifically, high-end apartments in Massachusetts and Virginia. Co-conspirators, including Junmyung, placed apartment leases in their names, or fraudulent identities, and paid for rent and utilities using structured money orders of prostitution proceeds. Men who solicited the brothels were extensively verified by Han, Junmyung and other co-conspirators. In all instances, the men provided personal information and selfies which allowed the network to screen the sex buyers and ensure that none worked for law enforcement and could shut down her business. The customer lists were maintained in phones associated with each brothel website. One such phone was recovered from Junmyung's residence in November 2023. The network used these phones to communicate with sex buyers and book and negotiate prices for their appointments. Once appointments were set, the women were notified by the holder of the phones, including Junmyung and Han, about their schedule for the day. After a day's work, the women stayed at the apartments overnight, so they did not have to find lodging elsewhere.

Members of the organization, specifically Han and others, including Junmyung acting at her direction, picked up the prostitution proceeds from the brothels and concealed the funds in various ways, including by purchasing structured money orders which were used to pay business expenses, by making structured cash deposits, and by moving the funds throughout accounts

managed by the co-conspirators or various third parties. The records maintained by the business were in the forms of appointment books and ledgers documenting volume of commercial sex dates and total earnings. By the time search warrants were executed in November 2023, this multiyear, multistate business was a thriving criminal enterprise that brought in millions of dollars and enticed dozens upon dozens of women to travel to other states to engage in prostitution.

### B. The History and Characteristics of the Defendant

Junmyung clearly had the skills and ability to maintain gainful employment, but he chose instead to play a role in this organization, a role that was critical to its success, and a role for which he was financially rewarded. Junmyung was compensated between $6,000 to $8,000 per month based on his total number of bookings that he booked each month and number of sex buyers that he adequately vetted. Likewise, he was compensated by Han in June 2022 for his willingness to sign a lease for an apartment that was used as a brothel. Two days later after signing the brothel lease, he deposited $35,700 in cash into his personal checking account. About two weeks after signing the lease, Junmyung used a portion of the illicit proceeds that he earned from Han's business to make a downpayment of $25,500 on a 2018 Chevrolet Corvette. While the number of appointments he made varied over the course of time, by any estimate Junmyung made at least $200,000 for his work in the organization from late 2021 until his arrest in November 2023. The government is not aware of attempts by Junmyung to withdraw from the organization or seek legitimate employment during his multi-year participation in this organization.

Junmyung's background provides little explanation as to why he chose to engage in criminal activity. He grew up in a household with financially and emotionally supportive and hard-working parents who pushed him to work and study hard. He had the chance to attend university in Korea and while he was unsuccessful there after a year, he enlisted in the military in his home country. He took English classes starting at age 21 and moved to the United States where

he continued his studies at local Massachusetts universities and obtained a bachelor's degree in international relations. Junmyung was presented with substantial opportunities in life to engage in lawful employment but chose to work for Han's illicit business instead. As with anyone that logically chooses to engage in criminal activity, deeming it more lucrative than other available legitimate work, when their illegal activity is detected, it is critical as a matter of specific deterrence that Junmyung face significant consequences for his actions.

### C. The Need for the Sentence Imposed – Deterrence and Protection of the Public

Junmyung's involvement in this criminal scheme ended not because he confronted a crisis of conscience; it ended because agents arrested him and each of the principal participants. The government believes that a meaningful period of incarceration is needed both to deter future criminal conduct from Junmyung and more broadly to deter others from engaging in illegal prostitution and money laundering schemes. This is especially important for a crime of this nature, which is frequently viewed by the public as not serious, and not likely to attract the attention of federal law enforcement. The organization was active; it was widespread; and although there were attempts to evade detection, it was relatively overt. The websites advertising the services were not hidden on the dark web, but were rather on the open internet, with website names that made them relatively easy to find.  While high-end prostitution networks of this nature are relatively common and are sometimes easy for local law enforcement to spot, there are significant challenges to investigating and prosecuting these types of prostitution and money-laundering networks, including language barriers, the inherently private nature of the prostitution activity, the desire for the patrons to remain anonymous (and their resulting covert behavior), and the frequent cash transactions in small dollar amounts (which become significant due to their volume, but which generally do not trigger reporting requirements or attract bank suspicion if artfully deposited).  It is important as a matter of general deterrence that when law enforcement invests the resources in

thoroughly investigating and uncovering such networks, as they did here with the participation of both federal and local law enforcement, there are significant consequences for the participants.

   D. **The Need for Supervised Release**

The guideline provisions for these charges includes a period of supervised release, ranging from one to three years. Junmyung's immigration status does not form a basis to depart from that recommended range of supervised release. This Court retains discretion to impose supervised release where it determines that supervised release "would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case." USSG § 5D1.1(c), comment (n.5). Imposing supervised release for a period of three years would serve as additional accountability to this Court should Junmyung return to the United States unlawfully and will deter the defendant from returning to the United States after deportation, unless he returns by lawful means.

   **III.** **Conclusion**

For all these reasons and considering the GSR as calculated in the Plea Agreement, and the factors enumerated in § 3553(a), the government respectfully recommends that the Court impose the sentence requested in the Plea Agreement. In addition, the Court should order forfeiture to the extent detailed in the motion for money judgment and preliminary orders of forfeiture.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ *Lindsey E. Weinstein*
LINDSEY WEINSTEIN
Assistant United States Attorney

April 16, 2025

## Certificate of Service

      I hereby certify that I submitted this document for electronic filing via the ECF system, which will send an electronic copy to all counsel of record who are identified on the notice of electronic filing.

By: /s/ *Lindsey Weinstein*
LINDSEY WEINSTEIN
Assistant United States Attorney
District of Massachusetts
